UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STACY ERWIN OAKES,

                Plaintiff,                              Case Number 17-11044

v.                                                Honorable David M. Lawson

KAREN WEAVER and CITY
OF FLINT,

                Defendants.

_____/

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE WITH PREJUDICE

Plaintiff Stacy Erwin Oakes is the former Chief Legal Officer of the City of Flint. She was fired by Flint's mayor, Karen Weaver, after Weaver apparently lost confidence in Oakes's leadership of the City's legal department. Oakes has filed a complaint in this Court alleging that the true basis for her termination is retaliation for her comments on matters of public concern, and that the firing violated the First Amendment and Michigan's Whistleblowers' Protection Act, and was contrary to public policy under Michigan state law. The defendants filed a motion for summary judgment, contending, among other things, that Oakes has not identified any protected conduct to support her theories of retaliation. Oakes's statements — nine in all — each were made is her capacity as the City's chief legal officer, undertaken in the course of performing the duties of her job. As such, they are not protected by the First Amendment, and cannot support a retaliation claim. Nor can they support claims under state law. Therefore, the Court will grant the motion for summary judgment and dismiss the case.

I. Facts

A. Background

The events in this case occurred among the tumult surrounding the City of Flint's receivership and municipal crisis over the contamination of the City's water system. Those events are well documented in other cases. *See Michigan Dep't of Envtl. Quality v. City of Flint*, 282 F. Supp. 3d 1002, 1004-1007 (E.D. Mich.) (summarizing the history of the water crisis mismanagement), *recon. denied*, 296 F. Supp. 3d 842 (E.D. Mich. 2017); *Concerned Pastors for Soc. Action v. Khouri*, 194 F. Supp. 3d 589, 593-95 (E.D. Mich. 2016) (discussing the City's financial woes and the appointment of an emergency financial manager, and transition from receivership). It is enough to say here that in November 2011, Flint was put into receivership, and Michigan's governor appointed an emergency financial manager to run the city under the authority of the Local Government and School District Fiscal Accounting Act, Public Act 4 of 2011 (Public Act 4) (later rejected by Proposition 12-1, effective August 8, 2012). In an effort to save money, the emergency managers (there was a succession of four of them) began purchasing water from the Karegnondi Water Authority (KWA), a consortium of cities and counties in southeastern Michigan that was created to build a water pipeline that will provide water from Lake Huron to Flint and the surrounding areas, instead of the City's traditional source, the Detroit Water and Sewerage Department (DWSD).

On March 25, 2013, Flint's City Council, while under receivership, voted to join the KWA. On April 17, 2013, Flint gave notice to Detroit that it would be terminating its contract and no longer purchasing water from Detroit beginning on April 17, 2014. The termination of the contract, however, occurred before the KWA pipeline was in place. Although Detroit offered to continue its

supply of water to Flint, the City declined the offer, and decided to activate its own moth-balled water treatment facility, drawing water from the Flint River. That move proved disastrous for several reasons. For one, the City's public works department did not add the proper treatment chemicals to the water supply, which caused the corrosive Flint River water to damage water mains and service lines, and water contaminated by lead and copper was distributed throughout the system. During that time, serious public health risks associated with Flint's water supply were discovered. For another, the City was not forthcoming about the contamination and exposed many of its citizens to a tainted water supply without their knowledge.

In April 2015, Governor Snyder appointed the City of Flint Receivership Transition Advisory Board (RTAB) to succeed the emergency managers under the Local Financial Stability and Choice Act 436 of 2012, Mich. Comp. Laws § 141.1563. However, the RTAB also was prohibited by law from "revis[ing] any Order that was implemented by the Emergency Manager during his or her term prior to one year after the termination of the receivership." Eventually, Flint contracted with the Great Lakes Water Authority (GLWA), the successor to the DWSD, to furnish drinking water, and the City set about a plan, fomented in part by a lawsuit settlement and in part by a court judgment, to rectify the contaminated water infrastructure.

## B. Plaintiff's Appointment and Her Duties

In November 2015, amidst widespread public outrage over the City's economic and water safety problems, the citizens of the City of Flint elected defendant Dr. Karen Weaver, a political novice, as their new Mayor, based largely on her promises to take decisive action to solve the water crisis. *See* Plf.'s Resp., Ex. 3, "Flint Mayor, Ushered in to Fix Water Crisis, Now Faces Recall," New York Times (Nov. 6, 2017) (Pg ID 564).

On March 28, 2016, Weaver appointed plaintiff Stacey E. Oakes as the City's Chief Legal Officer (CLO). The terms of her appointment stated Oakes's charge as follows: "Under the general supervision of the Mayor, the Chief Legal Officer shall provide any and all legal services and representation on behalf of the City of Flint as deemed necessary and appropriate to the requirements of [the Flint City Charter] §§ 4-602 through 4-606." Ex. 5, Terms of Appointment (Pg ID 572). Section 4-601 of the City of Flint Charter sets forth the following Responsibilities and Duties of the Chief Legal Officer:

> A. The individual appointed to the position of chief legal officer shall direct the legal affairs of the City and shall appoint all assistants. The assistants may be attorneys and other persons employed by the City and attorneys under contract to the City.
> B. The chief legal officer shall be the attorney for the City and shall direct the management of all legal matters in which the City is interested.
> C. The chief legal officer shall, either personally or through assistants, represent the interests of the City in all actions or proceedings by or against the City or its officers and employees.

Ex. 7, Flint City Charter § 4-601 (Pg ID 581).

Charter section 4-602 states that "[a]ll contracts, bonds or legal documents in which the City is concerned shall be prepared by or submitted to the chief legal officer for approval." Section 4-605 states that "[u]pon the request of the Mayor, a member of the City Council or the head of any agency, the chief legal officer shall give legal advice and opinions."

A 2006 lawsuit between then CLO Trachelle Young and the City Council resulted in a judicial interpretation of the charter sections governing the limits of the CLO's authority over Flint's legal representation. In that case, the Flint City Council was at odds with the administration over an issue, and wanted to hire its own lawyer. The Michigan Court of Appeals held, however, that the city charter entrusted "management of all legal matters in which the City is interested" to the CLO.

The court also held that the Flint Charter did not permit city council to hire its own lawyer. Instead, "[t]he CLO has sole authority to direct the legal affairs of the City, whether only one party to litigation is an entity within the City, or two entities within the City are adverse parties in litigation." *Young v. Flint City Council*, No. 263310, 2006 WL 3826976, at *2-3 (Mich. Ct. App. Dec. 28, 2006) (citations omitted).

## C. Plaintiff's Speech

The plaintiff asserts that she documented and conveyed to the Mayor and other public officials numerous concerns about illegal actions by the Mayor and various associates or advisors. She says that her repeated statements of opposition to the Mayor's actions exceeding her authority and putting the City at legal or financial risk led to her termination. She cites nine instances of speaking out, which of necessity are discussed below in detail, as they form the basis of the plaintiff's retaliation claims.

### 1. Personal Service Contract for General Michael C. McDaniel

Oakes believed that her reluctance to approve a personal service contract for Michael McDaniel was a factor in her termination.

On October 14, 2016, Oakes sent a memorandum to "General Michael C. McDaniel, Esq.," with a copy to Mayor Weaver, in which she spelled out concerns about the contract that McDaniel had proposed for the City to hire him as a consultant on the City's project to replace its lead water service lines. In her memo, Oakes stated that she was asked by the City's Interim Chief Financial Officer, David Sabuda, to discuss Sabuda's apprehension that McDaniel's primary employment as an Associate Dean at the Western Michigan University Thomas M. Cooley Law School made it important for the City to ensure that the terms of McDaniel's engagement would legally situate him

as an independent contractor to the City and not a municipal employee. Oakes pointed out problematic language in McDaniel's draft contract which in her opinion would result in McDaniel being classified as a city employee by the IRS. She also recited the history of her email correspondence with McDaniel between October 5 and October 14, 2016 over iterations of the draft agreement. Finally, she stated that McDaniel's requests to eliminate an indemnification clause from the contract could not be accommodated, and she proposed revised language clarifying the independent contractor status and specifying the terms for indemnification and liability insurance to be provided by McDaniel.

On October 18 and 30, 2016, McDaniel followed up with emails to Oakes stating that he had procured the required liability insurance and providing a revised draft contract which he believed would resolve all of Oakes's concerns. On November 9, 2016, McDaniel again emailed Oakes and requested, "[in accordance with] the Mayor's directive to resolve this today," that Oakes make certain final changes to the draft contract and approve it for execution by the City, so that payments on invoices previously submitted by McDaniel could be issued by the City. Oakes replied, with copies to Mayor Weaver, Aonie Gilcreast (the Mayor's advisor), Steve Branch (the Mayor's Chief of Staff), and several other City staffers, stating that if "someone in Administration can reply all to this communication confirming the Mayor's directive," then she would "ensure the changes are made." Branch soon replied to Oakes stating that "the Mayor's directive is to get this done," and directing Oakes to "do all things necessary to get the contract in place today."

Oakes testified at her deposition that she ultimately signed off on the contract "at the direction of the Mayor," and that she believed her reluctance to approve the contract was a factor in her discharge because she had "received a phone call from Richard Baird [Senior Advisor and Head

of Transformation to Governor Rick Snyder]," and also had a "meeting with the Mayor," in which Weaver was "very upset that [she] would not approve the contract," and where Oakes informed Weaver that she had raised her objections due to "several communications from the finance department [from] individuals who [were] concerned about their job and ethics and duty to do what was right on behalf of the City." Oakes testified that a predecessor CLO, Anthony Chubb, also had objected to terms of the contract, which McDaniel had been attempting to have the City execute since around February 2016. She stated that the contract called for McDaniel to be paid $10,000 per month for his services, despite the fact that "City Council was of the belief that he was a volunteer," and that McDaniel also "wanted the contract to be retroactive, to hav[e] a parking space, to be paid [for] travel, all of which represented that he was an employee and not an independent contractor."

## 2. Employment Status of Al Mooney

Oakes also spoke out on October 18, 2016 in an email to City CFO David Sabuda about another contract, this one with Al Mooney, who recently had retired from his position with the City and entered into a contract to provide certain personal services. Oakes wrote that she was responding to "concerns the Finance Department has raised in response to IRS findings," and that, based on her review of Mooney's contract, the City would need to either pay Mooney as an employee or revise his contract to establish his status as an independent contractor. Sabuda replied, stating his understanding that the contract called for hourly pay for a limited scope of work, and that the same form of contract had been determined to embody an independent contractor arrangement by the City of Grand Rapids legal department. Sabuda also stated that the contract had been reviewed by the City's law department earlier in the year, "with no exceptions noted," and he invited Oakes to meet with him in person to discuss the language of the contract and "iron out any differences."

Oakes testified at her deposition that she was concerned that, after Mooney had retired and purportedly entered into a contract with the City, he was "still operating as a City employee, and that he was using City resources, had a City ID, all of which were issues pointed out by the IRS in recent findings against the City of Flint." Oakes believed that her objections to Mooney's contract and her insistence that it be redrafted also contributed to the decision to terminate her, because the issues with his contract "occurred during the November, December [2016] time period."

### 3. Mayor's Advisor Aoine Gilcreast

Oakes's interactions with Aoine Gilcreast also caused some friction with the administration. Gilcreast testified at his deposition that he advised Mayor Weaver on political matters, and that he "sat in" on discussions about the Flint Water Crisis. Weaver testified that Gilcreast was a "volunteer" who worked "as many [hours] as necessary" each week, but at least "40 [hours per week] for sure." Weaver stated that she and Gilcreast would "meet about a lot of different things," and that she would "equate [his position with] Rich Baird's role with the Governor." When Baird was asked how often Gilcreast was present when he met with Weaver, he testified that he was "not sure [he] ever met with the mayor without [Gilcreast] being present." Oakes testified that she was concerned that Gilcreast "was acting on behalf of the City of Flint," by representing the Mayor and "asking questions" at important meetings, but that he had not executed a confidentiality agreement, despite the fact that the City's policy required all volunteers to sign one. According to Oakes, "the City Council consistently voiced concern about Mr. Gilcreast being present and acting on behalf of the City of Flint without going through the human resource department."

When Oakes was asked at her deposition if she had any "written complaints or any documentation" comprising reports of her concerns about Gilcreast, Oakes answered, "not in my

possession," but she asserted that "[m]any of those were submitted to the legal department," "[m]any of those were submitted by City Council members to other outlets," and "[i]t's very public and very known." Weaver admitted at her deposition that she tried to arrange funding to pay for Gilcreast to be hired as a staffer and paid $120,000 per year, and that "the State offered to pay him." That arrangement, however, apparently never was concluded. Oakes contends that the efforts to hire Gilcreast "[c]learly [were] a waste of taxpayer and other resources for a Mayor who is apparently unable to function independently," but she has not pointed to any evidence in the record suggesting that she communicated that concern to anyone before her termination.

Oakes testified that, on December 22, 2016, she informed Weaver, along with David Sabuda, Steve Branch, and Gilcreast himself that she "refus[ed] to take directives from Gilcreast." She also points to testimony by William Kim, one of the lawyers who worked for her in the CLO office, who attested that Oakes relayed concerns about Gilcreast to him "a number of times," including her apprehensions that "he was overly involved, that we wouldn't be covered, that privilege wouldn't be covered [sic] by discussions involving him, that his role in City government was undefined, [and] that there was uncertainty about his authority."

### 4. Payments to Barry Wolf

On December 22, 2016, Oakes sent a letter to the "Receivership Transition Advisory Board, c/o Chairperson, Frederick Headen, Legal Advisor to Michigan State Treasurer," regarding "Flint City Council Resolution #160547." Oakes wrote as follows:

> This letter is intended to inform you and the Receivership Transition Advisory Board (RTAB) of my concerns regarding Flint City Council Resolution #160547, which has [been] or will be submitted to the RTAB for approval at its January 2017 meeting. This resolution was enacted by the Flint City Council on December 12, 2016. It

purports to authorize the payment of $35,000 to attorney Barry A. Wolf, and to accept reimbursement from the State of Michigan in the amount of $35,000.

A resolution to this effect was presented to me for approval as to form. My department's standard practice, when reviewing proposed City Council resolutions authorizing financial expenditures, is to first determine whether the Finance Department has certified that funds are available by approving the resolution as to Finance. The resolution presented to me had already been signed by the interim Chief Financial Officer, David Sabuda, signifying approval as to Finance and certifying that the necessary funds were available. However, when I later reviewed the final documents as approved by City Council, it came to my attention that the Council-approved resolution *lacked* the signatures of myself and interim Chief Financial Officer Sabuda.

As a result, I requested additional information regarding this matter and inquired into the routing of this resolution. Unfortunately, I was unable to determine what happened to the resolution with the signatures attesting to approval as to Form and Finance, or why different paperwork lacking these signatures was submitted to the City Council. However, this additional inquiry has also brought to light two significant legal concerns that I call to the RTAB's attention.

Resolution #160547 purports to authorize the payment of $35,000 from Budget Line Item #101-101.100-801.500. A review of the Revenue and Expenditure Report for the City of Flint, dated 12/19/2016, indicates that Budget Line Item #101-101.100-801.500 represents the funds allocated to the "General Fund, City Council, Legal Services" line item. The report clearly indicates that the 801.500 "Legal Services" line item had $0 appropriated, spent $0 year-to-date through 12/31/16, had an available balance of $0, and was 100% utilized. . . .

Given that the revenue and expenditure report indicates that the necessary funds do not exist, I am forced to conclude that the approval by interim Chief Financial Officer Sabuda was in error. For obvious reasons, the City of Flint cannot make a payment when the account on which the payment is to be drawn is empty. At minimum, such payment would violate the City's budget. Since this is exactly what City Council Resolution #160547 purports to do, I must therefore deny approval for Resolution #160547.

In addition, Resolution #160547 attempts to justify this payment by stating that the Flint City Council retained attorney Barry A. Wolf to represent them in a conflict of interest. However § 4-601 of the Flint City Charter vests the Chief Legal Officer with the sole authority to "direct the management of all legal matters in which the City is interested" and to appoint legal counsel. The Michigan Court of Appeals, in the 2006 case of *Trachelle C. Young v. Flint City Council*, clearly established that the

-10-

Flint City Council was prohibited from appointing its own legal counsel and that the authority to do so was solely vested in the position of Chief Legal Officer.

Here, I never appointed Barry A. Wolf as counsel for the City Council. The Court of Appeals, in case number 334615, upheld my decision twice. City Council Resolution #160547 is thus factually untrue. In addition, any expenditure of funds by the City of Flint for such representation violates § 4-601 of the Flint City Charter, even if the funds were otherwise available.

For these reasons, I respectfully request that the RTAB carefully consider whether it should approve a City Council Resolution that (1) is factually untrue, (2) attempts to exercise power in a manner contrary to the Flint City Charter, (3) relies upon an assurance of reimbursement that does not appear to be legally binding, and (4) attempts to authorize the City to expend funds in excess of those that have been allocated. Given the precarious financial condition of the City of Flint, I am particularly concerned when the City Council and Finance Department authorize spending that is not properly budgeted or accounted for.

Plf.'s Resp, Ex. 31, Letter re: Resolution #160547 dated Dec. 22, 2016 (Pg ID 711-12). On December 27, 2016, Oakes sent an email to Headen which attached a copy of her letter, with copies to other RTAB members. In that email she directed the recipients to "please see the attached memorandum regarding Resolution #160547 which may warrant your attention due to perceived deviations from previously established practices and procedures involving the City of Flint's finances." Ex. 32, Email dated Dec. 27, 2016 (Pg ID 718). RTAB member Michael Finney replied to Oakes by email that same day, without copying any of the other recipients, and asked Oakes: "Did you bring this to the attention of David Sabuda? What was his explanation for authorizing the expenditure without budget $$ to cover it?" Ex. 33, Email dated Dec. 27, 2016 (Pg ID 723). Oakes replied to Finney, and wrote:

Yes, I have brought this to the attention of David Sabuda and the City Administrator.

I also previously explained to Richard Baird the ethical and legal issues that would rise if he attempted to make this expenditure conditioned on a promise to reimburse the City of Flint's Legal Department when I refused to authorize the attorney fees of

Barry Wolf out of the Legal Department's budget. Some of the same implication applied to the Finance Department[,] and the resolution being authorized without the budgeted funds represents the value placed on my legal advise [sic] and/or the length one will go to usurp the law.

I have not received an explanation.

I feel compelled to inform you that I am very concerned about the Governor's Advisor and members of City Council using political considerations and fraudulent activities to impose financial obligations on the City of Flint, while scapegoating the issues through me individually and as the Chief Legal Officer with the RTAB, Treasury, and MLive being in agreement and/or being used as the conduit.

*Ibid.* Oakes testified that the email exchange with Finney was "private," and that she did not know if her memorandum was circulated to anyone other than the recipients whom she copied. However, she "believe[d] that [Finney] subsequently passed on our private communication," and she "[didn't] know for certain" if the Mayor knew about the memo, but she subsequently received a phone call from Joe Ferguson, another RTAB member whom Oakes had copied on her email about the budget resolution. According to Oakes, Ferguson asked if she had "heard from anyone else," which in her view "suggests that the exchanges were circulated and known to Weaver."

### 5. Conflict of Interest with the Williams Law Firm

On November 22, 2016, Oakes sent a memo to Mayor Weaver stating her concerns about a proposed stipulation to substitute the Williams Firm as counsel of record for the City in the case of *Natasha Henderson v. City of Flint*, No. 16-11648 (E.D. Mich.), a wrongful termination lawsuit by Flint's former City Administrator who was terminated by Weaver on February 12, 2016. By late 2016 the case was pending in this district but was dismissed on summary judgment in August 2017. Oakes indicated that her memo was responding to an email by Weaver stating that the Mayor did not understand why Oakes had expressed concerns about the case since "[w]e have been preparing for

this case for over 6 months and you have never raised ethical or conflict issues," that "[t]his is not a new case and we were good until yesterday," and "[t]hat makes me think this is not about the City and has become personal."  Plf.'s Resp., Ex. 34, Memorandum dated November 22, 2016 (Pg ID 725-27).  Oakes wrote that in her opinion allowing the Williams Firm to substitute in as counsel for the City posed several problems, because, among other things: (1) the lead attorney from the firm had been present in a closed door meeting of the City Council where Henderson's termination was discussed, before the firm was retained to represent the City, and he therefore likely would be a fact witness in the case, (2) the Williams Firm had represented the City in other recent litigation where the City Council was joined as an adverse party, but lawyers from the firm would be in the position of defending depositions of City Council members in the Henderson case, (3) in Oakes's opinion the Williams Firm had been lax in defending the City's interests in the litigation between the City and its Council, had resisted directives to file appeals of the trial court's orders, on which the City later prevailed in the Michigan Court of Appeals, and had persistently pushed to settle the case despite the unfavorable terms proposed by the Council, and (4) the Williams Firm had been lax in communicating with Oakes about the status of the Henderson case, and had acted inappropriately in the conduct of litigation by, among other things, trying to have first Oakes, and then a junior lawyer on her staff, sign responses to the plaintiff's interrogatories, despite the fact that Oakes and her staff had no personal knowledge of any of the information disclosed in the answers.  Finally, Oakes stated the Williams Firm would have a conflict of interest because Weaver had retained and continued to employ the firm to represent her personally in various matters, and Oakes felt that would compromise the firm's ability effectively to represent the City's interests without ethical conflict.

6. Hiring of John Young

Oakes testified that in late 2016 she expressed concerns to Weaver about the terms of a contract under which John Young "was being paid by the State of Michigan to advise the City on the best course of action" relating to a proposed deal that would involve the City committing to have water supplied through the KWA pipeline. Oakes testified that she was concerned because (1) Young ostensibly was providing consulting services that imposed a fiduciary duty on him to represent the interests of the City in the negotiations for the KWA pipeline deal, but there was no contract in place, and Oakes never was presented any contract for Young to review or approve, and (2) after a construction management agreement for the KWA deal was drafted by the law firm Lewis & Munday, it was delivered to Young, who "removed all of the protections for the City of Flint." Oakes asked a lawyer at the Munday firm why the agreement had changed, and she was told the revisions were made by Young, which was "the first knowledge [Oakes] had that a John Young existed."

Oakes then met with Weaver to discuss her concerns, some time in October or November, but during the meeting she was told only that the Mayor's advisor, Aoine Gilcreast, would "talk to [Governor Snyder's advisor] Richard Baird about it." Oakes told Weaver "that was not appropriate," because Young was "not acting in the best interest of the City of Flint, and at a minimum as the Chief Legal Officer I need to be able to see what is in his contract." Oakes also later became concerned that Young recommended a construction engineering firm for the project, but "the due diligence was not conducted" with respect to selecting that firm, and she told the Mayor about that as well. During a later meeting on December 22, 2016, when Oakes again met with Weaver, the

Mayor "got very vocal and very upset and said that she had to work with the State and she was going to move forward."

### 7. Connector Pipeline Funding

On October 12, 2016, Oakes wrote a letter to Governor Snyder's advisor, Richard Baird, expressing her concern that the proposed deal to fund a 36-inch pipeline to carry water from the KWA included a general debt obligation on the City of Flint in the amount of $3 million to pay for construction, and that Baird had, during discussions with the Mayor and City Council, "pledge[d] to find these funds for the City," but "[t]o date the City has not received confirmation from the State of an appropriation for the $3 million funding balance of this project." Plf.'s Resp., Ex. 35, Letter dated Oct. 12, 2016 (Pg ID 729). Oakes concluded her letter by stating that "[d]ue to [the] declared water emergency, the City of Flint is formally requesting the Governor's Office to seek an appropriation from the State Legislature in an amount of $3 million to fully fund the thirty-six inch connector pipeline to connect the KWA water system with the City of Flint Water Treatment Plant." *Ibid.* Baird responded to Oakes in an email that she characterized as "brutal," writing that "[t]his correspondence demonstrates a lack of understanding of the agreement in place and seems to also reflect a lack of good faith," but that "[i]f Mayor Weaver or her senior advisor wishes to contact me and advise why they have changed their position, I will accept that call," adding that "receiving a letter like this without so much as a heads up is not the way to resolve issues." Ex. 36, Email dated Oct. 17, 2016 (Pg ID 730-31).

Oakes testified that, due to her concerns about the loan guarantee, she later refused to execute a loan agreement for $3.5 million to be loaned to the City by the State's Strategic Fund to pay for the KWA pipeline, because the City was "in receivership and [had not] been given a rating to accept

debt." Oakes stated that "[i]t was explained to [her] that the State had agreed that they would pay it off at some point in the future, and [she] merely requested to have that in writing," but she never received any written confirmation of the State's promise to forgive or retire the loan. On December 27, 2016, Oakes sent an email to Weaver and other City officials which, according to her, indicated that she would not sign a Memorandum of Understanding proposed by the State, because during a prior meeting Baird had "indicated that there would be no need for the MSF loan" to the City, but "the MOU represents that a loan will be used." Ex. 37, Email dated Dec. 27, 2016 (Pg ID 734-35).

### 8. Pipeline Indemnification Agreement

Some time in December 2016, Oakes received copies of emails between Richard Baird and various other state officials relating to review of the KWA Pipeline Memorandum of Understanding. During that discussion Margaret Bettenhausen, an assistant attorney general for the State, wrote that "regardless of the language used, we cannot include it if the intent is to assure the city that the state will indemnify it," and that "[t]he language below seems to pledge the assets of the state, which is prohibited." Plf.'s Resp., Ex. 38, Emails dated Dec. 20-21, 2016 (Pg ID 738). Oakes testified that she informed Weaver that she would not sign the proposed contract for construction of the pipeline because Baird had told Weaver and Gilcreast that the State would indemnify the City, but the pipeline construction agreement as drafted did not contain any indemnity provision and "did not have any protections" for the City. Oakes understood from the emails she had received that any provision by which the State would purport to indemnify the City would be prohibited by the State Constitution.

Gilcreast testified that during a meeting with 25 or 30 participants where the KWA pipeline deal was discussed — which appears to have occurred after Oakes sent her letter to Baird stating the

"formal request" for a written guarantee of loan forgiveness — Baird said "Mayor you got to trust me, for me to get this three million dollars in writing I think is going to really slow down what we're trying to do here," but "I'm going to make sure that you get your money." Baird testified that the State had committed only to afford some "comfort level" to the City that the State would make its "best efforts to ensure that if [the loan funds were needed for the construction the State would] support their forgiveness [or] support the sourcing of [other] funding to offset the City's obligation."

On January 6, 2017, after Oakes was terminated, the proposed MOU was executed by Weaver, Baird, and Larry Steckelberg ("Senior Policy Executive" for the State). Oakes points out that the signed MOU conspicuously lacked any guarantee of loan forgiveness, provided only that the State would make "best efforts" to avoid the need for the City to borrow any money, and stated that "the borrowing component will remain in place in the event it is needed to complete the project." The signed MOU also conspicuously did not include any endorsement by either the interim Chief Legal Officer (Oakes's replacement) or any officials of the City's Finance Department. Oakes also points out that, within hours after she was terminated on January 3, 2017, Weaver sent an email to Christopher Korleski, of the United States EPA, which attached a letter back-dated to December 27, 2016, and in that letter Weaver attributed several "schedule adjustments" on the pipeline project to "protracted negotiations between the City of Flint and the [Genesee County Drain Commission]" concerning the pipeline construction agreement. Oakes contends that the representation about "protracted negotiations" was false, and that Weaver never disclosed to the EPA that the true cause of the delay was Oakes's refusal to endorse the agreement due to her concerns about the hollow promises of loan forgiveness and absence of an indemnity clause.

9. Jail Holding Facility Agreement

In November 2016, Weaver sent a contract to Oakes that had been executed by Weaver and Genesee County Sheriff Robert Pickerell, which was to govern the operation of a jail holding facility for the City by the County. Some time after she received the contract to review, Weaver, Gilcreast, Sheriff Pickerell, and his undersheriff appeared personally in Oakes's office. The meeting also included Celeste Belle, an assistant prosecutor for the County who attended by phone. Weaver and Pickerell demanded to know the specific reasons why Oakes would not endorse the agreement, and Weaver "questioned [her] reasoning for not being able to provide the signature for the contract because the Mayor and the Sheriff had already signed off on it."

Oakes told Weaver that she would not sign the contract for several reasons, including because it purported to obligate the City to pay more than $75,000 without a resolution by the City Council to fund the obligation, which was beyond the spending authority that the Mayor personally could endorse under the City Charter. Oakes later sent a memorandum to Weaver on November 17, 2016 in which she advised Weaver of her "concerns about the City of Flint and Genesee County Agreement for Operation of Flint Holding Facility by Genesee County." Oakes pointed out several problems, including that (1) the contract referenced details in several schedules that were not attached to the copy provided to Oakes, and (2) it required the County to set aside only $50,000 as a self-insured reserve against claims by detainees, which Oakes opined was a hazardously low figure considering the probable financial exposure from such claims — in particular she noted a $36 million verdict that then recently had been returned in federal court in a jail abuse case.

On December 5, 2016, Oakes sent another memorandum to Weaver in which she restated her concerns based on her further review of the agreement and supporting documents. Oakes wrote as follows:

> As a result of [my] review of the proposed agreement [following discussions on November 17 and 29, 2016] I have identified four concerns. . . . First, authorization from the Flint City Council will be required. Second, the funding source for this Agreement is not specified and potentially exposes the City to significant encumbrances. Third, policy documents for the liability insurance involved need to be reviewed in order to determine the City's exposure. Fourth, some of the contract language is ambiguous and should be amended.

Ex. 41, Memorandum dated Dec. 5, 2016 (Pg ID 752-54). Oakes explained that (1) the agreement still provided for only a $50,000 SIR, and no copies of a purported liability insurance policy to cover detainee claims had been supplied by the County, (2) "[w]ithout an appropriate City Council resolution, the agreement would violate City law," and to Oakes's knowledge no corresponding resolution had been passed by the Council, (3) the agreement appeared to obligate the City to pay all costs of operating the facility and to seek reimbursement from the State, but, despite the County's representation that the cost would be funded by a State appropriation, the City's finance manager could not confirm that any appropriation had been passed, and (3) certain language in the agreement could be construed as obligating the City to indemnify the County against any claims arising from the operation of the facility, rather than the reverse. Oakes testified that she continued to refuse to sign the holding facility agreement, and that, as far as she knew, due to her refusal it never was consummated before her termination.

### D. Plaintiff's Termination

On January 3, 2017, Weaver called Oakes into a meeting. She asked Oakes who decided to close the City's legal department and allow all her staff to stay home on December 29, 2016, which was not a City holiday. Oakes stated it was her decision. Weaver then told Oakes about problems that the closure caused, including three instances where she and other City officials could not contact anyone in the legal department to consult with them or review documents that day. Weaver asked

"who thought [it] was a good decision" to close the department on a working day, and Oakes stated

that she did. Weaver "didn't really give [Oakes] much time to say anything," and then handed her

a termination letter and told her that she could speak to the City's Human Resource Director if she

had any questions. The concise letter stated only that "[t]he effectiveness of your management and

oversight of the City of Flint's Legal Department is questionable and I lack confidence in your

leadership." Def.'s Mot. for Summ. J., Ex. N, Letter dated Jan. 3, 2017 (Pg ID 372).

### E. Defendant's Justification for Termination

Although the termination letter was terse, Mayor Weaver testified to a litany of performance-

related reasons for her dissatisfaction with Oakes as the CLO. Oakes responded to each, after a

fashion. For instance, on the December 29, 2016 closure of the legal office, Oakes said that law

department personnel were working from home and available for consultation. She also testified in

an affidavit that she told Weaver of her intention to allow remote working, and Weaver did not

object.

Weaver contends that there were numerous complaints to her about Oakes's inability to get

along with other City staff. But Oakes testified that Weaver never informed Oakes before she was

terminated about any concerns relating to her competence. She added that, when Weaver told her

the City law department staff were "afraid to speak to [Weaver]," that was because Weaver came

to the department with Gilcreast in tow, and the legal staff were justifiably concerned, as Oakes had

mentioned to them, that any discussions they had with the Mayor would not be protected by attorney-

client privilege if Gilcreast was present. Oakes also points out that the City's HR Director, Charley

McClendon, testified that nobody ever complained to him about Oakes's performance or

competence, no grievances were filed against her, Weaver never spoke to him about any negative

issues with Oakes before she was terminated, and there was nothing in Oakes's personnel file that documented any problems.

Weaver testified that Oakes did not keep her apprised of developments in several legal matters, and that in several cases she learned that the City had settled pending litigation through news reports. But Oakes testified that she informed Weaver about all of those pending settlements before they were concluded, that she regularly reviewed the status of pending cases in meetings with Weaver, and that in one instance the news report simply was mistaken where it stated that a pending lawsuit had settled when in fact it had not.

Weaver testified that she questioned Oakes after she learned that Oakes had blocked the City's then-CFO (Jody Lundquist) from sending her emails. Oakes responded that the CFO was sending her too many messages. Oakes explained that she had blocked Lundquist because she continued to copy Oakes on correspondence that had nothing to do with the law department and did not require action from her. Weaver also conceded that, after she spoke to Oakes about the issue, Oakes and Lundquist had lunch and talked about it, and then Oakes removed the email block.

Weaver testified that payments to General McDaniel were delayed by five or six months because Oakes delayed approving his contract. But Oakes attested that the finance department first asked her to review McDaniel's contract on September 28, 2016, based on CFO David Sabuda's concern that McDaniel not be classified as an employee. Oakes communicated her concerns about the contract, and she documented her concerns in writing on October 14, 2016, after her initial review was challenged by Weaver. According to Oakes, McDaniel did not respond with a revised contract until October 30, 2016, two weeks later, and he continued to raise objections to certain terms in back-and-forth discussions with Oakes through early November. Nevertheless, at the

Mayor's direction, Oakes approved the contract on November 9, 2016, and the following day McDaniel "thanked [her] for [her] 'diligence and professionalism.'"

Weaver testified that while negotiations were ongoing for a new contractor to provide trash pickup services for the City, she told Oakes that the agreement was nearly concluded and that she would need Oakes to review it the following day. Yet when Weaver called the next day, she could not reach Oakes, because she was out of the country on vacation. Oakes attested that her absence on vacation in October 2016 had been approved by Weaver, and that she had told Weaver that if she could not be reached while away then Deputy City Attorney Angela Wheeler would be available to cover her duties. Moreover, when Oakes heard that Weaver wanted to speak with her, she called and texted Weaver several times, but Weaver never responded.

Weaver testified that she did not want the City to appeal certain orders of the trial court in litigation that arose around the City's switch to a new garbage hauling contractor, but that Oakes filed appeals of those orders, which Weaver learned about from news reports. Oakes asserts that the appeals were a "win" for the City, because the trial judge's orders directing Oakes to appoint Barry Wolf as counsel for the City Council were reversed and the court of appeals reaffirmed its previous holding that the Council had no authority to retain legal representation on its own initiative. Weaver also conceded that when Oakes informed her that the first appeal was filed, she said, "okay," and Oakes asserts that Weaver never told her to withdraw the appeal.

Weaver testified that Oakes "dressed unprofessionally many times," that "one time [they] were at an RTAB meeting and [someone took a picture] and passed it around because her dress was so tight." "One time [Weaver] told [Oakes] to fasten up her blouse because I don't know what

meeting you are going to with your breasts out like that."  But Oakes attested that "Weaver complimented me on my attire and never expressed a concern about my attire being unprofessional."

Finally, Weaver testified that she was surprised to see after she signed Oakes's terms of appointment that a severance provision had been added providing for a payment of $25,000, which she contends never was discussed or approved by her.  But Oakes testified that she did not prepare the terms of appointment, that she informed Weaver when she learned about the provision that it was in the contracts of several City employees, and that when Weaver told her to revise the contracts to replace the term with "something reasonable," Oakes promptly did so, and she was reappointed under revised terms that did not include any severance payment on July 7, 2016.

## F.  Procedural History

Oakes filed her complaint in this Court on April 3, 2017 alleging unlawful retaliatory discharge under the First Amendment via 42 U.S.C. § 1983 (Count I), violations of the Michigan Whistleblowers' Protection Act, Mich. Comp. Laws § 15.362 (Count II), and unlawful discharge contrary to public policy under state law (Count III).  The defendant timely filed her motion for summary judgment.

Defendant Weaver argues that each instance of Oakes's speech arose in the course of her official duties as Flint's CLO and therefore did not enjoy First Amendment protection.  And she adds that some of the items did not touch on matters of public concern.  She also contends that causation cannot be established because in many instances, Weaver was not informed of Oakes's communications, such as the correspondence between Oakes and the RTAB members.  And even if in other instances a causal link to protected speech can be inferred, the record is replete with

evidence of numerous problems with Oakes's performance that warranted her termination, none of which are pretextual.

As to the WPA claim, Weaver argues, based on persuasive rulings by various state courts, that advice by a city attorney about potential legal problems with City actions or contracts cannot logically be deemed to be a "report" of illegal activity, because, by definition, any legal officer continuously will be engaged in advising municipal officials about potential legal risks of proposed actions or policies, and, therefore, almost any communication by a municipal lawyer would be swept up in the ambit of "reporting" illegal acts.

Finally, the defendant argues that the public policy claim is a non-starter because it is based on the same facts as the WPA claim, and it is well established that the WPA provides the sole exclusive remedy for such claims, preempting any public policy cause of action.

Oakes responds that the purported reasons for her termination are flimsy and unsubstantiated. She insists that the true reason for her termination was her numerous objections to illegal and improper contracts and actions by the Mayor and various contractors doing business with the City, as well as her repeated objections about serious problems in the KWA pipeline project agreement and the State's proposed MOU with the City, and her memorandum to the RTAB advising the board not to approve the illegal resolution to fund counsel for the City Council in the garbage hauling litigation. She also contends that her speech touched on numerous matters of public concern including illegal payments to retained counsel of $35,000, the entry into unsecured debt obligations that the City had no capacity to repay amounting to more than $3 million, and an attempt by Weaver to commit the City to pay a contractor beyond her $75,000 budget authority without approval from City Council. And she contends that at least some of her speech was not within the scope of her

official duties, noting her communications with RTAB members, because she was appointed to represent the City and advise the Mayor and City officials, and she did not report to or have any official duties relating to the RTAB.

Oakes contends that there also is a fact dispute about causation, pointing to the timing of her termination in relations to her speech. And she says that she adequately has supported her claim under the WPA, because she reported numerous illegal actions and objected to illegal contracts and conduct by City officials and its contractors, and she wrote or spoke about those problems to several public bodies by informing the City and its officials, the RTAB members, and State representatives.

Finally, Oakes contends that if her claims cannot proceed under the WPA, then she should be allowed to pursue alternative relief on her public policy claim, because if the WPA does not apply, then her common law claim cannot be preempted by it.

## II. Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care*

*Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid*. (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

A. First Amendment Retaliation Claim

It is generally accepted that a plaintiff bringing a First Amendment retaliation claim via 42 U.S.C. § 1983 must satisfy three elements: "'(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.'" *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)). Oakes's First Amendment claim fails here because the undisputed facts show that she cannot satisfy the first element. The determination of whether a public employee engaged in protected speech is a pure question of law for the Court, not a question of fact or a mixed question of fact and law. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017) (holding that this rule was not abrogated by the Supreme Court's decision in *Lane v. Franks*, --- U.S. ---, 134 S. Ct. 2369, 2374-75 (2014), which held that "the First Amendment [] protects a public employee who provided truthful sworn testimony, compelled by subpoena, outside the course of his ordinary job responsibilities").

Although ordinary citizens asserting conduct protected by the First Amendment must show that their speech touches on matters of public concern, "[p]ublic employee plaintiffs are required to meet additional standards to establish that the speech at issue is constitutionally protected." *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). Certainly, a government cannot censor the speech of its employees as a matter of course, and "'cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Mayhew*, 856 F.3d at 461-62 (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). "However, because 'government offices could not function if every employment decision became a constitutional

matter,' *Connick*, 461 U.S. at 143, a public employee's First Amendment rights are narrower than the citizenry at large." *Ibid.* (citing *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968)). "'[T]he First Amendment protects a public employee's right, [only] *in certain circumstances*, to speak as a citizen addressing matters of public concern.'" *Ibid.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

"A public employee alleging First Amendment retaliation must satisfy three requirements." *Ibid.* "First, the employee must speak on 'matters of public concern.' Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties. Third, the employee must show that his speech interest outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Ibid.* (quoting *Evans-Marshall v. Board of Education*, 624 F.3d 332, 337-38 (6th Cir. 2010)). It is the second requirement on which Oakes falls short.

Before turning to that question, it is useful to address the defendants' argument that Oakes's speech did not touch on matters of public concern. The defendants' position is not sound. In several of the instances cited above, Oakes plainly was calling out the mayor and others associated with the administration for committing acts that were not authorized by Flint's charter or the ordinances enacted under it. Those criticisms certainly comprised "'matter[s] of political, social, or other concern to the community.'" *Mayhew*, 856 F.3d at 467 (quoting *Lane*, 134 S. Ct. at 2380). The Sixth Circuit has "consistently reiterated that allegations of public corruption 'are exactly the type of statements that demand strong First Amendment protections.'" *Id.* at 468 (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 543-44 (6th Cir. 2012) (collecting cases)). Oakes may have had personal reasons as well for leveling her criticisms and vocally refusing CLO sign-offs. But it does

not matter so much "*why* the employee spoke, but *what* [she] said." *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (stating that it is not "necessary for the entire expression to address matters of public concern, as long as some portion of the speech does"); *see also Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015); *Chappel v. Montgomery County Fire Protection District*, 131 F.3d 564, 574 (6th Cir. 1997) ("[It is] plainly illogical and contrary to the broader purposes of the First Amendment" to assert that "an individual's personal motives for speaking may dispositively determine whether that individual's speech addresses a matter of public concern.").

During the plaintiff's tenure as CLO, the City was mired in a receivership or, later, laboring under the watchful gaze and control of the RTAB board, which was appointed to succeed the emergency managers and to assure the City's eventual emergence from its fiscal ruin. The Mayor and City Council continually were at odds in the midst of complex negotiations involving various state and local political units aimed at finding a lasting and economically viable solution to ensure long term access to safe drinking water for all of the City's residents. Certainly the citizens of Flint would have reason to be concerned about proposals to commit the City to borrowing millions of dollars that it had no means to repay, and about the administration's engagement of multiple outside "consultants" in roles with questionable mandates, under ill defined terms and with nebulous authority and accountability, who were paid princely sums for their supposed services. *See Klosowski v. City of Bay City*, 696 F. App'x 707, 714 (6th Cir. 2017) ("[A] reasonable jury could find Klosowski's criticisms of spending [more than $15,000 annually] on the bascule bridges a matter of public concern."); *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 527 (6th Cir. 2015) ("Stinebaugh spoke to three council members to give them a citizen taxpayer's perspective

on the fire department's plan to expend [$474,000 in] public money on a new rescue truck. We have no difficulty concluding that Stinebaugh's speech was on a matter of public concern.").

Flint's citizens also would have good reason to be concerned about a move by the City's legislative body to appropriate $35,000 that the City did not have, to pay legal counsel that it had no authority to retain. The dispute over the retention of attorney Wolf fairly can be viewed as a continuation of the political sparring between the CLO and City Council over who had the sole power to appoint legal counsel for the City or any of its political units, which had arisen in the context of the garbage hauling litigation. But the fact that Oakes may have had some personal interest in the solution to a problem she spoke out about does not automatically render her speech purely personal. As the Sixth Circuit observed in *Mayhew*, speech concerning questionable exercises of the municipal hiring authority may touch on matters of public concern even where the speaker has some personal stake in the results of those practices. *Mayhew*, 856 F.3d at 469.

But as the City's Chief Legal Officer, it was Oakes's *duty* to bring these matters to the other city officials, who, nonetheless, may not have welcomed her viewpoints. For that reason and others, it is plain that she was speaking as a public employee, not as a private citizen. In drawing that distinction, the Sixth Circuit has "recognized several non-exhaustive factors to consider, including: the speech's impetus; its setting; its audience; and its general subject matter." *Mayhew*, 856 F.3d at 464 (citing *Handy-Clay*, 695 F.3d at 540). The "'who, where, what, when, why, and how'" of the statement all "inform the answer to *Lane*'s 'critical question': 'whether the speech at issue is itself ordinarily within the scope of an employee's duties.'" *Ibid.* (quoting *Lane*, 134 S. Ct. at 1379; citations omitted). And an official job description weighs heavily on the determination, coupled with the several "'*ad hoc* or *de facto* duties [that] can fall within the scope of an employee's official

responsibilities despite not appearing in any written job description.'" *Id.* at 465 (quoting *Weisbarth v. Geauga Park District*, 499 F.3d 538, 544 (6th Cir. 2007)).

All of the communications on which Oakes relies were made in her capacity as a public employee. That conclusion is ineluctable, not simply because she made all of her statements while she was at work. *See Garcetti*, 547 U.S. at 420 ("That Ceballos expressed his views inside his office, rather than publicly, is not dispositive."). Rather, each utterance, comment, and protestation fell comfortably within the ambit of her plenary authority and official duties, which charged her with managing all of the City's legal affairs, and with giving comprehensive advice to the City and its official on any matter that could implicate or impair the City's legal interests. Her various complaints about contracts, hiring practices, the terms of the KWA pipeline deal, and the authority to appropriate or expend funds and to retain legal counsel all focused on perceived legal or financial risks that the City could incur, or violations of its own or other pertinent statutes that could result from the contemplated acts or obligations. The City Charter expressly charges the Chief Legal Officer with "direct[ing] the legal affairs of the City," serving as "the attorney for the City," "direct[ing] the management of *all legal matters in which the City is interested*," and "[r]epresent[ing] the interests of the City in *all actions or proceedings by or against the City or its officers and employees.*" Plf.'s Resp., Ex. 7, Flint City Charter § 4-601 (Pg ID 581) (emphasis added); *see also* Ex. 5, Terms of Appointment (Pg ID 572) ("[T]he Chief Legal Officer shall provide *any and all legal services and representation on behalf of the City of Flint* as deemed necessary and appropriate to the requirements of [the Flint City Charter]") (emphasis added); *Young v. Flint City Council*, No. 263310, 2006 WL 3826976, at *2-3 (Mich. Ct. App. Dec. 28, 2006) ("The CLO has *sole authority to direct the legal affairs of the City*, whether only one party to litigation is an entity

within the City, or two entities within the City are adverse parties in litigation.") (emphases added).

The plaintiff contends that she had the *sole* authority to handle *all* of the City's legal affairs and to represent *all* of its legal interests in every way, in *any matter* that might implicate them. That broad, plenary authority certainly covered every one of her communications in which she advised the City's executive and legislative branches about perceived irregularities or illegalities in the City's affairs.

Under the circumstances, the plaintiff's duty also plainly comprised in an *ad hoc* fashion her advice to members of the RTAB, which held the final authority and reserved the final right to approve or disapprove all enactments by the City Council while the City transitioned from receivership. The fact that the City Charter and the plaintiff's terms of appointment did not explicitly mention the RTAB or make her expressly accountable or available to its members as a legal advisor is not dispositive. "Speech by a public employee made pursuant to *ad hoc* or *de facto* duties not appearing in any written job description is [] not protected if it 'owes its existence to [the speaker's] professional responsibilities.'" *Fox*, 605 F.3d at 348 (quoting *Weisbarth*, 499 F.3d at 544). The fact that a public employee communicated concerns to officials in other departments or outside the normal purview of her daily correspondence also is not dispositive, because "escalating reports up the organizational chart" also may be — and in this case was — within the scope of her duties, formally defined or otherwise. *Mayhew*, 865 F.3d at 465. "'[W]hen a public employee raises complaints or concerns up the chain of command at [her] workplace about [her] job duties, that speech is undertaken in the course of performing [her] job.'" *Ibid.* (quoting *Fox*, 605 F.3d at 350). Advising RTAB members not to affirm a resolution with a questionable legal and financial basis was well within the plaintiff's professional responsibility to advise the City's officials and protect its

legal interests in all affairs. Under the circumstances, the RTAB was, if not explicitly, certainly in a *de facto* sense part of the pertinent "chain of command," since it held the final authority to approve or disapprove legislative acts of the City. *See id.* at 465-66.

Moreover, even comments made to outside private entities with no official status have been found to fall within the scope of an employee's official duties, where the employee is obligated by her position to make the communication. *See Fox*, 605 F.3d at 348-49. Here the plaintiff ardently contends that it was her solemn duty to advise the RTAB as she did about the problems with the proposed resolution. Indeed, if it was not her job to give such advice about the propriety of the resolution, whose could it have been?

The plaintiff asserts that she was fired because of the legal positions she took as CLO. And, Mayor Weaver's protestations and performance complaints notwithstanding, that is likely true. But that is not the first time a lawyer was fired for giving legal advice the client did not want to hear. Clients are entitled to discharge their attorneys when the lawyer charts a course that may be at odds with the client's objectives, even when doing so may be improvident. And in a public employment context, when that advice and expression of concern comes from one charged with the duty of advising and commenting, the First Amendment will not shield the lawyer from the employment consequences of speaking out. *See Garcetti*, 547 U.S. at 422 (noting that "Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. . . . When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.").

Because all of the communications Oakes relies on fell within the scope of her official duties, none of the speech that she cites comprised protected conduct for her First Amendment retaliation claim. The defendants therefore are entitled to judgment as a matter of law in their favor on Count I, which will be dismissed.

## B. Whistleblowers' Protection Act Claim

To prevail on a claim under Michigan's Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.362, a plaintiff must show that (1) she "was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v. Lake County*, 493 Mich. 167, 175, 828 N.W.2d 634, 638 (2013). "Protected activities consist of '(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation.'" *Hilden v. Hurley Med. Ctr.*, 831 F. Supp. 2d 1024, 1042 (E.D. Mich. 2011), *aff'd*, 504 F. App'x 408 (6th Cir. 2012) (quoting *Chandler v. Dowell Schlumberger Inc.*, 456 Mich. 395, 399, 572 N.W.2d 210, 212 (1998)); *see also Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 455 Mich. 604, 610, 566 N.W.2d 571, 575 (1997).

The plaintiff's claim under the WPA fails as a matter of law because she has offered no evidence to support her position that she made any communication about an actual, accomplished illegal act to any public body. The plaintiff has not put forth any evidence that she either reported or was about to report any actual "violation of a law, regulation, or rule" to any public official or entity. Most of her communications involved prospective acts or arrangements that, according to her, were not consummated during her tenure due to her objections. Moreover, in the majority of

instances, the objections that the plaintiff raised were not to "illegal" conduct or arrangements, but merely ones which, in her view, would expose the City to imprudent legal or financial risks. In the several cases where the plaintiff comes nearest alluding to any actual violation of the law, those supposed violations were prospective only, and, according to her record, actually forestalled during her tenure as CLO based on the objections that she raised. Her communications, therefore, were not "reports" of any completed violations of law, but merely advice that was intended to — and did — *prevent* violations of the law by the responsible officials.

The plaintiff objected to several terms of the contracts under which McDaniel, Mooney, and Gilcreast were engaged by the City. But she has not pointed to any law or evidence to show that any provisions of those contracts were *illegal*. Instead, her complaints centered on the ambiguous classification of them as contractors versus employees, or the absence of certain provisions for the City's benefit such as confidentiality, insurance, or indemnity clauses. She has not cited any authority holding that omission of such clauses from a contract with the City was unlawful. As to the classification concerns, the plaintiff did not advise that engaging any individuals on certain terms was strictly illegal; instead, she simply stated that the City would, depending on the clarity of the terms, either have to pay the persons as employees or ensure that the proper circumstances were established by their contracts to establish them as independent contractors. With respect to John Young's contract, the plaintiff's principal complaint was there was none — or at least none that she had been given to review. But it appears to be undisputed that Young was engaged by the State to provide services to the City, and the plaintiff's main complaint about him was that, without a formal arrangement, the City may not have sufficient guarantees that he adequately would honor his fiduciary duty faithfully to advise the City's officials with due regard to the City's interests. The

plaintiff has not pointed to any evidence sufficient to show that any term of Young's engagement with the City was in any sense strictly illegal.

With respect to the KWA pipeline agreement and memorandum of understanding, the plaintiff objected that they imposed on the City an obligation to borrow money from the State that it could not repay, and that the agreements lacked a guarantee of loan forgiveness and provisions for the City to be indemnified by the State against claims or losses incurred in the course of the construction project. But the plaintiff's advice on those points was that the agreement exposed the City to significant, and in her view unwise, levels of legal or financial risk. She has not pointed to any legal authority establishing that it was *illegal* for the City to enter into either the MOU with the State or any part of the underlying pipeline construction and funding agreements. Moreover, the plaintiff explicitly asserts that those agreements never were executed during her tenure, principally because she refused to approve them. Therefore, again, even if any of the contemplated acts could have been illegal, none of her communications with anyone about them comprised a "report" of any actual accomplished illegality.

The plaintiff contends that the jail holding facility agreement with Genesee County was illegal because it would have committed the City to pay funds beyond the amount that the Mayor was empowered to expend without approval by the City Council. But she has not pointed to any evidence in the record to show that any such expenditures actually were made, or inevitably would have been made, without a corresponding resolution properly authorizing the payment of funds up to the amount incurred.

The plaintiff also asserts that the resolution authorizing payment to Barry Wolf for representing the City Council in the garbage hauling litigation violated the City Charter because no

funds had been appropriated to satisfy the retainer, and because the Council did not have the authority to retain legal counsel on its own initiative. But again it is evident from the record that, under the circumstances, the purportedly illegal resolution could have no actual final effect until it was approved by the RTAB, and the entire purpose of the plaintiff's communication was to *prevent* that from happening. Therefore she was not "reporting" any accomplished illegality or violation of the law, but simply advising the RTAB members, prospectively, to *avoid the potential illegality*, by rejecting the resolution.

None of the plaintiff's communications comprised accounts of actual completed illegal acts, and most of her complaints did not concern any purported illegality at all. Therefore, she cannot satisfy the first element required under the WPA of showing that she engaged in conduct protected by the Act. The defendants are entitled to judgment in their favor on Count II.

## C. Public Policy Claim

Although in Michigan, most employment relationships are presumed to be terminable be either party at will, *Landin v. Healthsource Saginaw, Inc.*, 305 Mich. App. 519, 523, 854 N.W.2d 152, 158 (2014), state courts have recognized a cause of action for wrongful discharge "based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable," *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 695, 316 N.W.2d 710, 711 (1982)); *see also Morrison v. B. Braun Medical Inc.*, 663 F.3d 251, 256 (6th Cir.2011). The exceptions are limited, however, and the cases have recognized only three: "(1) explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty (e.g., the Civil Rights Act, Mich. Comp. Laws § 37.2701; the Whistleblowers' Protection Act, Mich. Comp. Laws § 15.362; the Persons With Disabilities Civil

-37-

Rights Act, Mich. Comp. Laws § 37.1602), (2) where the alleged reason for the discharge was the failure or refusal of the employee to violate a law in the course of employment (e.g., refusal to falsify pollution reports; refusal to give false testimony before a legislative committee; refusal to participate in a price-fixing scheme), and (3) where the reason for the discharge was the employee's exercise of a right conferred by a well-established legislative enactment (e.g., retaliation for filing workers' compensation claims). *Landin* 305 Mich. App. at 524, 854 N.W.2d at 159.

Moreover, the Michigan appellate courts have held that "'the remedies provided by the WPA are exclusive and not cumulative.'" *McNeil-Marks v. Midmichigan Medical Center*, 316 Mich. App. 1, 25, 891 N.W.2d 528, 540 (2016) (quoting *Landin*, 305 Mich. App. at 532, 854 N.W.2d at 163). "Thus, when a plaintiff alleges discharge in retaliation for engaging in activity protected by the WPA, '[t]he WPA provides the exclusive remedy for such retaliatory discharge and consequently preempts common-law public-policy claims arising from the same activity.'" *Ibid.* (quoting *Anzaldua v. Neogen Corp.*, 292 Mich. App. 626, 631, 808 N.W.2d 804, 808 (2011)).

The plaintiff did not mount in her response any developed argument in support of her public policy claim; she merely asserts, without elaboration, that if she cannot proceed under the WPA, then she should be allowed to pursue her claims on an alternative basis under the public policy doctrine. However, it is evident that she cannot establish that her conduct fits within any of the discrete circumstances defined by the doctrine that would prohibit her discharge.

*First*, to the extent that the plaintiff relies on her supposed reporting of any illegal activity, all such claims are preempted by the WPA and are not viable under any construction of the public policy doctrine. *McNeil-Marks*, 316 Mich. App. at 25, 891 N.W.2d at 540. *Second*, the plaintiff has not pointed to any evidence in the record to show that her conduct — apart from any purported

"reports of unlawful activity" — falls within the protections of the public policy doctrine. Of the three circumstances noted above, the only one even alluded to by the plaintiff in her briefing is her contention that she refused to endorse several contracts and a resolution containing purportedly illegal terms. But the plaintiff has not pointed to any legal authority establishing that her "approval" of any such documents, if she had given it, would have involved any cognizable illegal act *by her*. She does not contend that her office afforded her any legal capacity actually to bind the City to any of the supposedly illegal terms — that authority apparently was reserved exclusively to the Mayor or the City Council, in every instance of which the plaintiff complains. So far as the record suggests, even if the plaintiff had acceded to demands for her "approval," the most she might have been "guilty" of would be ordinary malpractice: giving her client (the City or its officials) poor legal advice. However sound or prudent the basis of her refusal to endorse the arrangements in question, and regardless whether *some other public entity or official* would have acted illegally by entering into those obligations or enactments, the plaintiff has not pointed to any legal authority to suggest that her acquiescence would have made *her* guilty of anything.

The plaintiff has not established that any of her oonduct or communications comprised any refusal to perform any illegal act, and she has not pointed to proofs that could establish either of the other pertinent circumstances under the public policy doctrine. And the plaintiff cannot show that she engaged in any protected activity that could support any public policy claim not preempted by the WPA. The defendants therefore are entitled to judgment as a matter of law in their favor on Count III of the complaint.

### III. Conclusion

The plaintiff has not established that any of the nine instances of speaking out upon which she relies enjoyed protection under the First Amendment against retaliation. The plaintiff has not offered evidence to establish a material fact issue on whether she engaged in protected conduct under the Michigan Whistleblowers' Protection Act. And the plaintiff has not shown that she falls within any of the exceptions to the at-will employment doctrine under Michigan's common law public policy cause of action.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #14] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 25, 2018


<div style="border:1px solid">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 25, 2018.

s/Deborah Tofil
DEBORAH TOFIL

</div>